May it please the Court, Joshua Gittleman representing Denise Martin. Your Honors, I'd like to get right to the heart of the matter. The inappropriateness of the Department of Corrections' response to the workplace harassment which was reported. There's an issue of material fact as to whether DOC, the Department of Corrections, failed to take action that was reasonably calculated to end the harassment because the investigation was not prompt. The action taken took an exorbitant amount of time and I'm sure that the other side will argue that they took interim action. These interim actions, given the cases that I will get into, were inadequate to even be So the relevant time period here is 10 months. There's a 10-month span from Martin's complaint to the suspension of the harassment of Warwick. And in considering that the Department of Corrections did not interrogate the harasser of Warwick until seven months after Martin reported the harassment. So that's the timeline that we're dealing with. The interim actions, which are wholly inadequate given the nature of the explicit content circulated and how fast it can circulate through the video and text, through phones and group chats, the defense will first point that they issued a private cease and desist memo to Warwick, this being 48 days after the initial complaint. But her initial complaint not only went into the fact that Warwick had these images and was spreading it, but also to the general spread of these explicit photos. These explicit photos went to confirmed four members of the staff, but that's four for four of everyone who was interviewed. And further, there's no event that the members or the people who were incarcerated in this prison had access, but they were aware of the rumors and the existence of these videos and pictures. So at the very start, that first cease and desist memo is inadequate because it did not address the complaint. And to add to that, even if that reprimand was a public reprimand, it was inadequate because there's a higher bar for adequacy and reasonableness in dangerous professions. For example, this court in Howley considered the fact that firefighters had to depend on another, that undermining of their respect could lead to a more dangerous situation. And here, you know, the incarcerated members were well aware and making comments to Martin regarding these photos that spread. Similarly, and even more similarly in Boston, the Southern District came to the same or hoisted up the same rationale regarding correctional officers as Martin was here. Next, the inadequate interim measure taken by the Department of Corrections was a public memo four months after the complaint from Martin to the investigating officer. So at this point, the images have been able to spread for four months. And that four months delay is a question of the jury as to promptness and as to reasonableness. The courts in this district and this court in Howley have considered the totality of the circumstances and have even held that five weeks, given the employer's response, was unreasonable. So what we have here... This is Judge Bianco. Let me just ask you a couple of questions regarding your preliminary there. I want to focus on what is... I think the facts are largely undisputed. Howley, there were other issues besides, you know, it wasn't about the five-week investigation primarily in Howley. It was about that there was a mere two-day suspension and the perpetrator there admitted to the harassment right away. But here, the investigation, although it took a long time, was opened immediately, right? Your client was spoken to, and the investigation was opened within 24 hours, right? Correct? Correct, Your Honor. All right. And then the cease and desist order to Rorick occurred... Your client didn't come back to work until April, and the cease and desist order occurred before she returned. And then she said at her deposition that Rorick did not harass her. She had no issues with him after the cease and desist order. So there was no continuing harassment, which obviously would be a problem if they were not separated in some way and there were continuing harassment. That would be a problem. But there was no harassment by Rorick after the cease and desist to him, right? Yes, Your Honor. As for the harassment, though, more generally, she complained, although she could not get more than the original two names, who I believe were Monroe and another officer... With respect to the other officers, every name she gave, she gave four names. She gave two on one occasion, two on another, Myers and Monroe. And then later on, she said Munn, Munn, and Romero. They immediately went and talked to those employees who denied sharing it or talking about it. But every single time your client gave Ms. Frazier a particular name, that person was spoken to immediately. And there was this general memo read to all the employees in June. So I think the only real issue in the case with respect to the promptness is whether or not... And the inmates issue, I'm just curious, what do you think they should... Your client never gave them a name of specific inmate who was harassing her about the photos. So what are you suggesting they should have done about her general complaint that inmates were talking about this too? What should their response have been? I believe that the inmates is a secondary issue that came about because of the delayed response, because of the delayed investigation. So they had determined that they couldn't take certain actions until this investigation, I guess, came to a full close. So before there was even an original interrogation, it was five months. Five months after that report, Munlin and Romero, COs, were then interrogated. And then it was another two months after that where they had asked Rorick, did you do this? So now we're already seven months out. Now if they had done that in a reasonable amount of time, they would have figured out that this was spread through a group chat, that this was a widespread issue, and they could react to it. Instead, they went through a protracted and long, I guess, excuse me, extremely long investigative process for what is more of a straightforward issue, which allowed, without the fellow officers being on alert, that there could be so it allowed it to eventually spread to the people who had lived there. So essentially, what we have here is that because they didn't react originally, and months and months go by until they decided they had enough information, it was able to spread to anybody. All right, thank you. Judge Wesley? I have no questions, thank you. Judge Katzen? Yes, I just had a couple of questions, just to be clear. The original complaint was filed on February 16th of 2016, and there was an email to issue a cease and desist to respondent on April 4th, 2016. Is that correct? Correct. So why is that? So it's basically two months, less than two months, for the cease and desist to be issued to the respondent. Why is that too long a time? So two points on that, Your Honor. One, if you were looking to stop the spread of these explicit photos and videos, you can't just stop them at the source. It's like putting out a building fire and then allowing it to spread once it's already gone to another building. And then two, bringing in Howley and Dawson, which address this higher standard and in a dangerous profession, whether it be a firefighter or a correctional officer, there needs to be a higher bar for steps taken here. So what we have here is that they only addressed part of the issue. They took an exorbitant amount of time for this investigation and eventually addressed the issue in a way that could be determined by a jury to not be reasonable four months later or 10 months later. So there are really two parts to your claim. One, that the investigation took too long to conclude. And second, that the Department waited too long to take any steps to stop the hospital work environment itself. Is that correct? Yes, Your Honor. Essentially, the steps were not prompt. And when they finally had gotten to the point where they addressed it in a broad enough and a tailored enough way, it was already too late. It was already four months or even 10 months later. Let me ask you, if I could, about the state human rights law claim. The district court said that you had abandoned it by not re-alleging it in your amended complaint. And the state asked us to affirm the dismissal of your state human rights law claim on that ground, the red brief on 31 to 32. I may have missed something, but I don't think that you discussed this point in your brief. Can you explain why the state claim is not abandoned? And secondly, why the Department would not have sovereign immunity in any event? Yes, Your Honor. I'm going to save my breath here and just concede the point that we will not be pushing the New York state human rights law statute or court of action. Thank you. We will now hear from Ms. Olson, I believe. Good morning. May it please the court, Caroline Olson on behalf of the New York State Department of Corrections and Community Supervision and the state of New York. Docs engaged in a prompt and thorough investigation of Martin's hostile work environment claims, imposed significant interim remedial measures that culminated in serious discipline, a three-month suspension without pay, and a permanent transfer. In light of this response, the district court correctly held that Docs was entitled to summary judgment. I will first start with Martin's claim that Docs' response was unreasonably delayed. As Judge Bianco pointed out, Docs opened an investigation immediately, and within 24 hours, Martin was on the phone with the superintendent to speak about her claim. The investigator then immediately began communications with Martin, and it's important to remember here, not only was she on leave during this period, but she was out of the country from February 22nd to February 27th. Notwithstanding that, once she returned to the country, the investigator was on the phone with her gathering facts, contact information for the relevant corrections officers, the only two that she had specifically identified, and also beginning to do legal research to understand whether or not there was even a Title VII nexus, given that this involved conduct that was largely outside of the workplace, at least as it appeared initially. It's also important to remember that when Docs then took the first interim measure, which Martin concedes was effective in preventing any further discrimination from Rourke himself, none of the evidence at that point had been substantiated. All we had were statements of what are admittedly serious misconduct, but just statements without any supporting evidence, and notwithstanding that, Docs took significant action to issue a decentification order to Rourke. It then followed up only a month and a half after she returned from leave to read, to ensure that all security officers for nine consecutive shifts were read a memorandum about the appropriate workplace conduct. It's important to note here on page 37 of the record that Martin really testified that the rumors and harassment that she complained of really started in earnest when she got back. And so it was a relatively short period from when she returned from leave, and she's claiming that the rumors really started in earnest until the workplace memorandum was read. And in that light, it's important to remember as well that this is a prison, and so the, and these are not workers who have regular access to computers, so really the only way of getting an announcement out to all staff is to take the measure of reading from the workplace memo and making an announcement at the beginning of the shift. And that has important security implications and costs that this was making. It's not something, a ministerial action, but something that actually requires taking time away from having security officers on the floor to make sure everyone understands the zero tolerance policy and that misconduct of this kind is not accepted. And as she testified, as Martin testified in her deposition, the chatter of what she complained of has largely stopped because, as she attributed to, the fact that her coworkers were spoken to by docs. So not only do we have prompt action, but we have effective action. Ms. Olson, this is Judge Bianco. Let me just ask you, I think the point I want you to address is this issue of the memo going to the coworkers in June. I think one of the primary arguments is to the extent that the issue here was the spread of the photos and officers talking about the photos and the inmates talking about the photos, their argument is that there, that could have been prevented. There was no reason for that memo not to have been read to all the employees much earlier in time, February, March, April, and that delay in reading that memo to the employees resulted in the spread of the photos among the officers and the inmates. So why, there was no information that they had in June that they didn't have in February, and that wasn't even a disciplinary thing, just reading of the memo. Why couldn't that have been done earlier and prevent the spread? A couple of points, Your Honor. The first is there was actually more information in between February and June. At that point, they had more conversations with Martin. She hadn't even provided the text messages until March. At that point, Fersher had had the opportunity to speak to the only two individuals that Martin had identified by name. At that time, it was not clear how far the images had spread, if at all. Remember, all Martin did was say, here's some text messages, and we know from Moore and Myers that they had said they received it on a group text message where they didn't recognize any of the other numbers. So it's not clear if anyone at the prison other than Moore had actually received these images. There's no evidence as to how far they spread. And even at the end, after her deposition, Ms. Martin was unable to say how many individuals had received the images, nor is there any evidence in the record that anything more than four individuals or a handful of individuals actually received them. So we're dealing with a number of unsubstantiated claims. We're also dealing with, as I said, a prison context where what may seem like a ministerial act, reading from a memo, as I said, actually entails quite a significant administrative burden that DOCS is sort of in the best position to judge the security risks as to whether having to take the time out to read this at the beginning of nine consecutive shifts, that has implications for security on the floor. And so to do that actually requires a lot of thought to make sure that they are right and that this action is appropriate and necessary and that the benefits of doing that outweigh the costs. It's also important... Let me just ask you, my other question relates to her testimony in her deposition that she complained to sergeants about the behavior of the inmates and her level officers and that Sergeant White told her essentially, you know, this is what happens when you send pictures like that around and did nothing to try to address it. Why isn't that of concern? A couple of points. As a general matter, her testimony was incredibly imprecise as to what she actually told her sergeants and when that actually occurred. And there are only really two specific instances in the deposition where she reportedly told any sergeant about this kind of inmate complaint. One was to Deputy Velez, and this is the record at page 39, and Deputy Velez said you should write those inmates up and responded appropriately in providing a means for her to take action to protect herself. And Martin confirmed that she never actually availed herself of those remedies to actually do so. And it's also clear from the record that this was at a time... It appears that this was at a time when work was already on suspension, which is a remedy that Martin herself has alleged was what she wanted and was sufficient and largely dealt with her concerns. The only other person she actually specifically identified as having concerns about was Sergeant White. And again, the complaint had no details about really what she told him specifically, and there's no information about timing except that at page 89 of the record, it appears that, again, RORC was already suspended. And so at that point, docs had already implemented what is admittedly very severe and effective punishment against RORC. And so there's really not a whole lot of detail about what she reported, when, to whom, or how this is affecting her or even compromised her ability to complete her job. No one... She has not, for example, said that despite this chatter, she's been unable to serve as a correctional officer or perform... Or cite any specific instances where it interfered with her daily work. All right. Thank you. Judge Westley? I have no questions. Thank you. This is Judge Kaplan. I would like you to address our court's decision in Howley versus the town of Stratford. And that was a case where Judge Keir says, and I'm quoting, that even a single incident of such harassment could be so publicly humiliating as to result in an intolerable alteration of, in this case, in that case, a female firefighter's working conditions. In an occupation whose success in preserving life and property often depends on firefighters' unquestioning execution of line-of-command orders in emergency situations, the fomenting of gender-based skepticism as to the competence of a commanding officer may easily have the effect, among others, a diminishing of respect according to the officer by subordinates, and thereby impairing her ability to lead in the life-threatening circumstances often faced by firefighters. Isn't this case here, Martin's case, analogous to Howley? Or why isn't it? I mean, she was subjected to gender-based humiliation, and a reasonable jury could conclude, could it not, that it diminished her authority and credibility in a workplace that really requires that she have that kind of authority and credibility. How would you distinguish this case from your case from Howley? Absolutely. So, there are a couple of very important distinguishing features. The first is the conduct that happened in Howley was very public. The female firefighter was subjected to sex-based slurs in front of all of her co-workers, and the perpetrator did not deny the conduct, and so there was no fact investigation required to determine what had actually happened, how far the conduct had spread. In this case, by contrast, we had a number of very vague allegations which were not substantiated, and when they were, she at least provides specific names, they were followed up with. The second is the context of what was it reasonable for docs to take in light of the circumstances. So, in Howley, there was a very long delay before any remedial action. It was about five weeks, but when it happened, it was very clear that the fire department was really just brushing off her concerns because they imposed a two-day suspension with a mere recommendation that the perpetrator apologize, which was never followed up on, and he did not in fact apologize. Here, we have a series of escalating remedial actions that involved the interview or interrogation of 10 witnesses, a subpoena to get phone records that culminated in a three-month suspension without pay, and also a permanent transfer, and as Ms. Martin testified in her deposition, he did not qualify for a promotion which he otherwise was otherwise available. And so, it's a combination of just the complexity of the investigation and the appropriateness of the remedial action, and to my colleague's point that there's some kind of higher bar in the security context, I take his point. These allegations are very serious, and it's important that her co-workers cooperate with her, but there are also countervailing concerns. One is the security interest at the prison and the fact that the docs have to weigh both concerns. I guess I don't understand your point about what the security issues would be involved in having the officials read what is required in terms of good behavior. How does that create a problem? It's not a problem. It's a cost that docs made a calculated decision that the cost, i.e., the time of having the security officers detained in order to read that to them, is time that they're not on the floor ensuring the security and the safety of everyone in the prison. Even beyond that, as the record here is very clear, there are also concerns about the rights of the other officers. Sgt. Rorick, for example, had his own rights and had docs estimated the kind of swift justice that Martin is requesting that could have subjected docs to liability for not completing a full investigation or exercising some kind of disciplinary punishment that is only within the authority of the Bureau of Labor Relations. But isn't it the case, that the docs eventually read the workplace conduct rule? Absolutely. In June 10th, the workplace conduct rules were read at nine consecutive shifts for rumors. The docs then made the decision that that was an effective means of tamping down discrimination, and she testified at her deposition. But doesn't the mere fact that it was read, doesn't that suggest that there really weren't any substantial costs at all? Otherwise, docs might not have done it. I don't think so. It's a reflection what is the progress of an evolving investigation where the fact finders were gathering information, and at that point, after she had returned from leave and confirmed that she was being subject to rumors and harassment, and Frasier was able to confirm that through her constant communications with Captain R2, that's when docs believed that it was appropriate to act. The fact that they didn't do it immediately doesn't suggest that there was never any cost. It was a matter of the evolving information available to docs, and concerns about what the situation was on the ground. So going back to your answer with respect to Howley, are you saying that there has to be a widespread dissemination in order for a claim to proceed? I think every claim, as this court has said, every claim is different, and it's a totality of the circumstances analysis. So on the facts of this particular case, the investigation proceeded appropriately in light of what vague and generalized statements and information that Martin was providing to Frasier on the ground. But it is a case-by-case determination. In this particular instance, the investigation was appropriate. Howley presented a very different set of factual circumstances. Thank you. We'll hear from Mr. Gittleman in rebuttal. Thank you, Your Honor. First, on the Howley case, as to it not being public, just as this case not being public, just as Howley was, I think the explicit content, you know, these are videos and photos, and they reached out to four of the four people who Frasier had interrogated, had gotten the photos, they were in a group chat, and they eventually reached inmates. So as to the fact whether or not it was public, I believe it was public with extremely sensitive information. And then on to the point that the Howley investigation or the Howley facts were more straightforward. And so that the investigation should be vastly different. The idea that they couldn't interrogate Rowick until seven months after the reported claim because they wanted to have all the evidence, it just doesn't sound and then holds up in a reasonability test. You know, this is an investigation. There's no one undercover. He admitted when interrogated that he had the photos, and then Frasier made the decision that he must have been the one who spread it. Now, had that interrogation happened within a month, two months, even three months, this is four months after, then they could have issued that employee-wide or officer-wide warning earlier on. But because the basic initial steps when it comes to just comments and reasoning were not taken until months and months out, it allowed the situation for her to get worse and worse. And so the response to the complaint was not nearly as tailored as it should have been, and it was inadequate considering the dangers of her profession. They let her sit in a situation where it became more dangerous because she was undermined, her authority was undermined over a prolonged period of time. And I think that's my point. Thank you. Thank you. Thank you both for your arguments. The court will reserve decision.